*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DONALD VINCENT MCCOY,

        Defendant-Appellant.

UNPUBLISHED
January 7, 2020

No. 343160
Macomb Circuit Court
LC No. 2017-001181-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LESLIE CECILIA METCALFE,

        Defendant-Appellant.

No. 343597
Macomb Circuit Court
LC No. 2017-001182-FC

Before: SHAPIRO, P.J., and GLEICHER and SWARTZLE, JJ.

SHAPIRO, P.J. (*concurring in part and dissenting in part*).

Four heroin users acted in concert to purchase a small quantity of the drug divided into four "dime" packets. It was later determined that the packets contained fentanyl in addition to heroin. Tragically, one of them, SL, who was only 16 years of age, overdosed and died. Defendants were convicted of delivery of a controlled substance causing death, MCL 750.317a, and delivery of less than 50 grams of a controlled substance, MCL 333.7401(2)(a)(*iv*). Metcalfe was sentenced to imprisonment for 15–40 years and McCoy to 15–80 years' imprisonment.

Obtaining the heroin involved multiple steps. SL, Metcalfe and McCoy all lived in the same mobile home community. Wayne Williams had been living with SL at her home for several months. SL initiated the course of events. She and Williams contacted their own dealer, purchased a quantity of Xanax and each took five pills. SL then messaged Metcalfe, a heroin

user and a friend of her family, and asked if Metcalfe could help SL and Williams obtain some heroin. Metcalfe called McCoy because he knew someone who could sell them heroin. SL and Williams walked over to Metcalfe's home as did McCoy. Williams and SL gave McCoy $40 for him to use to pay for the heroin. They also gave McCoy $10 for bus fare to go to the dealer's location in Detroit. Sometime later, McCoy returned to Metcalfe's home and handed over 3 of the 4 packets. SL and Williams appeared at McCoy's home a few minutes later to get the $2 in change from the $10 given for bus fare. The two then went back to Metcalfe's home and snorted the heroin. They each passed out. Later, Metcalfe discovered that SL's lips were blue and was cold to the touch.

The majority concludes that Metcalfe's and McCoy's convictions of delivery of a controlled substance causing death should be affirmed as well as the sentences imposed. Because I am bound by *People v Plunkett*, 485 Mich 50; 780 NW2d 280 (2010), I concur in affirming the convictions but, for the reasons set forth below, question the reasoning of that decision and ask that the Supreme Court revisit the issue now before us.

Regarding sentencing, I believe the trial court erred by scoring OV 14 and OV 10 as to Metcalfe and would remand for her to be resentenced. I would also remand for resentencing as to McCoy because the sentence was imposed, in large measure, based upon the trial court's statements regarding the social problem of opioid addiction and the likelihood of death.

## I. *PLUNKETT* AND JOINT PURCHASES OF DRUGS

Throughout the many years our State has prosecuted drug offenses, possession and delivery had always been considered two different crimes. The first addresses someone who uses or abuses drugs and the second someone who sells drugs for profit. In *People v Plunkett*, 485 Mich 50; 780 NW2d 280 (2010), however, the Supreme Court, on a 4–3 vote, eliminated this distinction and held that anyone who buys drugs is per se guilty of aiding and abetting the delivery of drugs. *Plunkett* was based on a simple but purely formalistic syllogism: (1) drug sellers cannot sell drugs without buyers; (2) buyers therefore assist the dealers by buying their drugs; therefore (3) buyers are guilty of aiding and abetting a drug delivery every time they buy drugs.

In *Plunkett*, the Court departed from decades of caselaw in which no court of record had held that participating in a joint purchase constituted aiding and abetting the person charged with the actual sale (i.e., delivery with intent to distribute) of the drugs.[1] Research does not reveal a single reported case, prior to *Plunket*, holding that a fellow-buyer or fellow-user may be held guilty of the far more serious offense of drug delivery. If, as *Plunkett* suggests, the clarity of its buyer-equals-abettor syllogism is so evident, why did *no* court in Michigan ever employ it before? *Plunkett's* holding that purchasing drugs jointly with another user constitutes aiding and abetting the drug dealer is a radical shift in the law and one which seems to be based on judicial

---

[1] *Plunkett* also did not discuss *People v Aaron*, 409 Mich 672, 733; 299 NW2d 304 (1980), which held that the intent to commit the underlying felony is not sufficient to convict of felony murder. Rather, to convict a defendant of murder, malice must be shown. *Id*.

public policy preferences rather than the text of the statute or the intent of the legislature. It elevates typical drug user behavior, i.e., the sharing of drugs and needles, to a life offense should someone die.[2] There is no basis to conclude that the passage of a statute making dealers subject to greater punishment if the buyer dies was intended to alter the long-understood separation between dealers and buyers and how the law treats them.[3] Moreover, such an interpretation ignores the real behavior of drug users: they share drugs and they join together in order to pool enough money to purchase, yet they are not drug dealers themselves. "Among groups of regular drug users, on any given day the role of 'dealer' might be filled by whoever happens to have gas money, a connection to a supplier or a working phone." Goldensohn, *They Shared Drugs. Someone Died. Does That Make Them Killers?*, New York Times (May 25, 2018).[4] And it appears that given the interpretation adopted in *Plunkett*, that Michigan's statute is among, if not alone as, the most punitive in the nation. See Humphrey, *Dead on Arrival: Illinois' Drug-Induced Homicide Statute*, 14 TM Cooley J Prac & Clinical L 277 (2013).

For these reasons I respectfully suggest that the Supreme Court use this case to reconsider the validity of the analysis in *Plunkett*, whether its reasoning is sound and whether it is consistent with substantive justice.

## II. SENTENCING

### A. METCALFE—OV 14 AND OV 10

In sentencing Metcalfe, the trial court scored OV 14 at 10 points, a score requiring a finding that "[t]he offender was a leader in a multiple offender situation[.]" MCL 777.44(1)(a). We review de novo whether the facts found by the trial court are adequate to satisfy the trial court's scoring decision, *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), and we

---

[2] This is not to say that a drug user may not be charged with murder or manslaughter respectively if he supplies another user with a dose that he knows to be dangerously tainted or fails to aid an overdose victim he observes and the delay results in the other user's death. These charges, however, require real proof of intent, knowledge and causation unlike the omnibus effect of MCL 333.7401(2)(a)(*iv*), in which any joint user of drugs is held criminally liable for the death of another regardless of ill intent or causation.

[3] As Justice Ginsburg noted in her concurrence to Justice Scalia's opinion in *Burrage v United States*, 571 US 204, 219; 134 S Ct 881; 187 L Ed 2d 715 (2014): "I do agree that 'in the interpretation of a criminal statute subject to the rule of lenity,' where there is room for debate, one should not choose the construction 'that disfavors the defendant.' " Quoting majority opinion at 216.

[4] The article also notes the failure of these laws to accomplish their purported goals, paraphrasing the opinion of a Minnesota prosecutor that "[h]e has found no reason to believe such cases deter users or dealers, and says they rarely lead to high-level suppliers." <https://www.nytimes.com/2018/05/25/us/drug-overdose-prosecution-crime.html> (accessed December 19, 2019).

cannot "affirm a trial court's scoring decision merely because *any* evidence in the record supports that decision," *People v Rhodes*, 305 Mich App 85, 88; 849 NW2d 417 (2014).

In justifying the scoring of OV 14, the trial court stated, "Had [Metcalfe] not made the call and solicited the drugs, we wouldn't be here today." [5]  The majority upholds the scoring based on its finding "that Metcalfe directed the drug transaction by making the arrangements on SL's behalf and calling McCoy to solicit his purchase of the drugs."

The majority's analysis fails for two reasons.  First, although it notes the "preponderance of the evidence" standard, its application of that standard is essentially no more demanding than the "any evidence" standard rejected in *Hardy*.  See *Hardy*, 494 Mich at 438.  And, rather than actually attempting to determine who, if anyone, was the "leader" of the transaction, the trial court simply noted the role Metcalfe played and did not consider it in relation to the actions of the others.  Using the trial court's standard, any of the four participants (including SL had she survived) could have been found to be the leader, since if any had not participated, no crime would have occurred.

For example, SL was the initiator of the entire transaction.  Had she not texted Metcalfe and asked for heroin, none of the subsequent events would have occurred.  Had someone other than SL been the victim, it would have been easy for the prosecution to argue that SL was the leader: she was the one to repeatedly request that Metcalfe help her find heroin to buy; it was her request for heroin that initiated the entire course of events; she brought her boyfriend along and he paid for the drugs; and she purchased the heroin from McCoy, gave him the money and received the four packets.  In addition, SL's boyfriend was the "money man" and without him no drugs would have been purchased.  And McCoy could be considered the leader because he was the one who actually met with the dealer and purchased the heroin they used.  The trial court's determination that "none of this would have happened" but for Metcalfe's involvement is true for each of the four participants.[6]  There was no leader in this case.

By contrast, all Metcalfe did was make a call to McCoy to inquire about buying heroin.  She did not purchase the heroin, did not supply the money for it and did not distribute it to the others.  It is fair to say that Metcalfe was at home minding her own business when SL called her and repeatedly asked if Metcalfe could help her obtain heroin that night.  The moving force behind this drug transaction was SL and Williams—they asked for the heroin, they paid for it and then they consumed it.  All Metcalfe did was make a phone call.  Had it been Metcalfe who died, the prosecutor would have pointed at SL as the leader with the same vigor as he pointed at Metcalfe, and Metcalfe would have been portrayed as a relatively innocent participant who would be alive today if SL had not called her and suggested they get some heroin.

---

[5] OV 14 was not originally scored but after the court struck the scoring for OV 1 and OV 2, the prosecution sought to have OV 14 scored.

[6] Notably, there was a fifth participant, the actual drug dealer, but he was not charged in SL's death.

In sum, the evidence that Metcalfe was the leader is limited to the fact that she called McCoy (on SL's request) and that the drug use took place in her home. However, the prosecution must produce more than "any evidence" to uphold the scoring of an OV. *Hardy*, 494 Mich at 438.

I similarly disagree with the majority's view that OV 10 was properly scored 10 points as to Metcalfe on the grounds that "[t]he offender exploited a victim's . . . youth . . . , or the offender abused his or her authority status." MCL 777.40(1)(b). MCL 777.40(3)(c) defines "exploit" as "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). Given that the initial request came from SL, I do not see grounds to conclude that Metcalfe exploited SL. Metcalfe merely did what SL asked her to do. As an adult, Metcalfe should have dissuaded rather than assisted SL in obtaining heroin, and was negligent or perhaps grossly negligent in that regard, but that does not rise to the level of manipulation which requires an affirmative act.

Similarly, OV 10 cannot be scored on the grounds that Metcalfe abused her authority status. The statute defines "abuse of authority statutes" as "a victim was exploited out of fear or deference to an authority figure." MCL 777.40(1)(d). Assuming Metcalfe was an authority figure, there has been no showing that the SL was afraid of Metcalfe or that her actions were the result of deference to Metcalfe. SL wanted to purchase heroin and asked Metcalfe to help her do so—Metcalfe should have refused to do so, but did not manipulate SL and did not employ fear or a demand for deference at any time. Because the scoring errors affected Metcalfe's sentencing guidelines range, I would remand for resentencing. See *People v Francisco*, 474 Mich 82, 91-92; 711 NW2d 44 (2006).

### B. MCCOY

I would also remand for resentencing as to defendant McCoy, whose actions in this case were limited to responding to Metcalfe's request and going to the dealer to get the heroin the four of them were jointly purchasing. He was a heroin addict. There was no evidence that he was a heroin dealer. His guidelines were properly scored, but the trial court's comments during sentencing indicate that it relied on an incorrect understanding of the crime. The trial court stated:

> What you did that night, this delivering that drug, was no different than had you taken a revolver over there and put five bullets in the chamber of a six chambered gun, asked the child to spin the revolver, put it to her head and pull the trigger . . . .

This view of the case is simply inconsistent with the facts of the case and of the heroin epidemic. McCoy did not create a situation—per the court's example—in which SL had a 4 out of 5 chance of dying or anything resembling it. The actual statistics show that 494,000 people

reported using heroin in 2017, most presumably did so on multiple occasions.[7] In that same year, approximately 15,000 people died of heroin overdoses.[8] Conservatively assuming 1 million uses, that would make the chance of death 1.5% as to any single use of heroin. The heroin epidemic is a serious problem that government must act to address. However, to compare a single sale of heroin to a 5 out of 6 chance of death in Russian roulette is not mere hyperbole; it represents a clear misunderstanding of the actual danger presented by McCoy's actions. Indeed, the trial court stated on several occasions that although McCoy was "not necessarily a bad person," it imposed the sentence because it felt that society was not taking the problem seriously enough. That may be so, but the sentencing of an individual defendant is not the mechanism to address the failure of other branches of government to act effectively to prevent opioid-related death.

## III. CONCLUSION

Because I am bound by the decision in *Plunkett*, I concur in affirming defendants' convictions while suggesting to the Supreme Court that they reconsider that decision. I dissent as to the sentences imposed and would remand for resentencing.

/s/ Douglas B. Shapiro

---

[7] Center for Disease Control and Prevention, *Heroin Overdose Data*, <https://www.cdc.gov/drugoverdose/data/heroin.html> (accessed December 27, 2019).

[8] *Id*.